# CHARLESTON.

THE NORMAN LUMBER COMPANY *v.* KEYSTONE MANUFACTURING COMPANY.

(No. 5212)

Submitted November 3, 1925. Decided December 8, 1925.

1. SALES—*In Sale of Lumber of Specified Kind and Quality, Buyer Having no Opportunity to Inspect, There is Implied Warranty That Lumber Shall be of Kind and Quality Specified.*

   The rule is that in the sale of lumber of a specified kind and quality, executory for future delivery, the buyer having

no opportunity for inspection, but relying on the seller to select, there is an implied warranty that the lumber shall be of the kind and quality specified.  (p. 522.)

(Sales, 35 Cyc. p. 160.)

2.  SAME—*Ordinarily Buyer of Chattels, Attempting to Rescind, Must Rescind in Toto; Buyer of Eight Cars of Lumber to be Delivered Singly Might Reject Four Last Cars and Rescind as to Them.*

Ordinarily, the buyer of personal chattels, who proposes to rescind the contract for their purchase, must rescind *in toto*; but where there is a contract for the sale of eight car loads of lumber of a given kind and quality, not to be executed by a single delivery, but was delivered singly at different times in a period running over four months, although four of said cars had theretofore been delivered and accepted by the buyer, the buyer may reject the four remaining cars, delivered afterward at different times, where the lumber in said last mentioned cars is not of the kind and quality specified in the contract, and may have rescission as to them, the contract in such case being severable, and the breach thereof being in a material matter.  (p. 552.)

(Sales, 35 Cyc. pp. 139, 140.)

3.  SAME—*After Seller's Refusal to Accept Goods Rejected by Buyer, Buyer May Dispose of Them, and Interpose Defense of Seller's Noncompliance With Contract; Out of Proceeds of Goods Rejected by Buyer and Sold by Him on Seller's Refusal to Take Them Back, Buyer May Reimburse Himself for Only Such Expenses as Are Reasonably Incurred in Making Sale.*

Where the buyer rejects said lumber for the reason aforesaid, and notifies the seller of his action, and the seller insists that he has fully performed the contract, under the circumstances in this case, the buyer may dispose of the lumber at the best price obtainable, and interpose, when sued, the defense of the seller's non-compliance with the contract, it being a case in which fair dealing calls for the buyer to act as agent for the seller *ex necessitate rei*.  Out of the proceeds of such sale, the buyer may re-imburse himself for only such expenses as are reasonably incurred in making said sale.  However, the utmost diligence and good faith will be exacted from the buyer who thus elects to bear the burden of agency.  (p. 525.)

(Sales, 35 Cyc. p. 160.)

4. SAME—*On Resale of Lumber Which Did Not Comply With Contract as to Kind and Quality by Buyer, Measure of Seller's Damage is Proceeds of Resale, Less All Reasonable Expenses Incurred in Taking Care of and Selling it.*

In such a case the measure of plaintiff's damages is not the contract price, but the proceeds of the re-sale of the lumber, less all reasonable expenses incurred in taking care of and selling it.   (p. 528.)

(Sales, 35 Cyc. p. 580.)

5. SAME—*Issues of Fact Held For Jury, or Court Acting in Lieu Thereof.*

All these issues of fact—whether the lumber delivered was of the kind and quality required under the contract; whether the defendant had accepted or rejected the goods by its subsequent dealing with the plaintiff; the reasonableness of the expense charges, and what was a reasonable time to wait before selling if the defendant rightfully rejected the lumber; whether said lumber was disposed of at the best obtainable price; and whether defendant acted in good faith —were for the jury, in this case the court acting in lieu thereof.   (p. 530.)

(Sales, 35 Cyc. pp. 575, 576, [Anno.].)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Randolph County.

Action by the Norman Lumber Company against the Keystone Manufacturing Company.   Judgment for defendant, and plaintiff brings error.

*Affirmed.*

*W. B.* and *E. L. Maxwell, Brown, Jackson* and *Knight,* and *Lon H. Kelly,* for plaintiff in error.

WOODS, JUDGE:

The Norman Lumber Company, plaintiff, is located in Louisville, Kentucky, while the Keystone Manufacturing Company, defendant, maintains its chief office in Elkins, West Virginia, and a branch office in Philadelphia, Pa.  Both companies are manufacturers and dealers in lumber.   The lumber in question in this case was shipped by the plaintiff from its Louisville yards to defendant at Philadelphia.

On the 7th day of June, 1920, the defendant wrote plaintiff stating that it was in the market for certain lumber, and gave defendant an order for five cars of "No. 1 and No. 2 common soft yellow poplar," "National Rules of Inspection;" and on July 12, an order for ten cars, "No. 1 poplar, soft yellow stock," "National Hardwood Lumber Association Rules." The record speaks of shipment and delivery of four of the cars under the first order, as follows:

| Car | Shipped | Delivered |
|---|---|---|
| I. C. No. 852 | July 20 | August 15 |
| C. B. Q. No. 113438 | July 21 | August 15 |
| R. I. No. 37528 | September 3 | September 28 |
| G. T. No. 13984 | September 10 | November 18 |

and under the second order, as follows:

| Car | Shipped | Delivered |
|---|---|---|
| U. P. No. 95573 | September 1 | October 2 |
| I. C. No. 142191 | September 2 | October 7 |
| Frisco No. 29601 | September 17 | November 3 |
| M. R. & St. L. No. 20838 | September 17 | October 14 |

There was some controversy over all of said eight cars; but settlement was made as to four of them, leaving four in controversy here, namely: car R. I. No. 37528, shipped under first order, and cars U. P. No. 95573, Frisco No. 29601 and M. R. & St. L. 20838, under the second order. On September 28, defendant's customer rejected car No. 37528, and defendant wrote plaintiff that the lumber was "hard white hickory poplar, badly warped and twisted, and is nearly all miscuts." Thereupon plaintiff wrote defendant that it was sending Shannon, an inspector, "to examine the lumber shipped in R. I. car No. 37528, and if you have any other cars of ours that you are not satisfied with we wish you would show the lumber in them also to him." Shannon saw the car prior to October 7, and says: "It had a bad appearance." A National Inspector was put on this car, and his certificate bearing date of October 13, is exhibited with the evidence. Plaintiff offered evidence tending to show performance of the contract by shipment and delivery of the

lumber to the Philadelphia branch of defendant company, claiming that lumber was accepted, and no complaint made except as to car No. 37528. Defendant offered evidence tending to show the rejection of the lumber upon inspection on all of said four cars, on the ground that it was "hard, white hickory poplar" that had little, if any, salable price in the market and was unfit for its own use. It claims that the plaintiff, through its agent Shannon, made an agreement with it that the lumber was to be sold at the best possible price for plaintiff's account. While the fact that there was such an agreement is denied by Shannon, the defendant proves it by a preponderance of the evidence. However, there is doubt as to the authority of Shannon to make such an agreement. Aside from this the defendant stands on its legal rights to reject the lumber and upon the plaintiff standing on its insistence that it has performed its contract, under the circumstances of the case, it had a right to sell the lumber and account to the plaintiff for the proceeds. It was proved that the lumber was sold to the best possible advantage by the defendant for the account of the plaintiff. The defendant had made advance payments on the invoices before the delivery or inspection of the lumber in order to take advantage of the 2% discount. Other pertinent facts will appear in the body of this opinion.

The plaintiff instituted its action of assumpsit for a recovery of the full contract price of said lumber. The case was first submitted to a jury, which failed to agree, and thereafter by an order duly entered, it was, by agreement of the parties, submitted to the court in lieu of a jury, upon the same evidence which theretofore had been submitted to a jury, the parties agreeing "to abide the result of the suit." Upon the hearing the court, acting in lieu of a jury as aforesaid, held to the effect that the proof established that the lumber in the cars in controversy was not of the kind and quality required under the contract; that the defendant rejected each of them; that it was entitled to a rescission as to them; that under the circumstances of this case, the defendant properly, as the agent of the seller, *ex necessatate rei* sold said lumber at the best price obtainable; and, that the excess of the contract price over the price thus received should be abated,

and the defendant required to pay on the basis of the price received. On this theory an account between the parties was stated, resulting in a finding that the defendant had overpaid the plaintiff the sum of $9.41. Judgment was thereupon rendered in favor of the defendant for that amount. It was to this judgment that the plaintiff prosecutes its writ of error.

The plaintiff contends that the court erred in its judgment for the reasons: (1) That the inspection of the National Hardwood Association is controlling in the transaction. (2) That the sale was executed, and in such case there can be no rescission of the contract for breach of warranty of quality. (3) That the contract must be rescinded *in toto* if at all. (4) That the defendant did not have the right to reject the lumber and sell it as the agent of the seller *ex necessitate rei.* (5) That the court failed to apply the true rule as to the measure of damages in this controversy. We will consider these points in the order mentioned.

Some of the cars were accompanied by a certificate of the National Hardwood Lumber Association's Inspector, and the Rhode Island car, was inspected after the delivery by such inspector. The rules of this association provide: "When an inspection by an authorized inspector of the National Hardwood Lumber Association is completed, the inspector shall deliver to the member requesting the inspection a certificate in duplicate certifying to the amount and grade of the lumber so inspected. This certificate is final for settlement as between seller and buyer in all cases where an agreement as to the application of National Inspection exists between the parties." It will be observed, that the inspection provided for is final as between the seller and buyer only as to amount and grade.

In a letter of July 7, preceding the order of July 12, under which the lumber in question was shipped, the defendant stated: "We are in the market for ten cars of 5/4 No. 1 common Poplar, and 2 cars of 8/4 No. 1 common Poplar, provided you are in a position to furnish *soft, yellow Poplar.*" The order referred to again provides that the commodity is to be "soft, yellow poplar." The order further states: "We would be glad to have you forward acknowledgment of this order, accepting the conditions and

specifications made, otherwise it will be impossible for us to use it, as· we must have on this order a good grade of poplar.'' After some of these shipments were made we again find the defendant as early as September 24, in a letter to the plaintiff, stating: ''The simple fact is that the inspector cannot make this stock satisfactory from a texture point of view  *  *  *  This is hard, white hickory poplar. *  *  *  The matter was handled with you specially, asking that nothing but soft, yellow poplar, be applied on this order and that nothing else could be used. We are up against a situation where this class of poplar doesn't fill the bill, regardless of what it might inspect or the question of inspection.'' Four days later the defendant again wrote plaintiff: ''This stock is even worse than we first reported. This stock is of that same hard, white hickory poplar, badly warped and twisted, and is nearly all miscuts  *  *  *  simply a lot of junk.'' The same strain runs through numerous letters between the parties after this until December 15. On the latter date the defendant wrote the plaintiff: ''We are not questioning the grade of this lumber, but we are just questioning the *kind* of lumber you have shipped us. You were to ship us soft yellow poplar and you have shipped us anything but that.'' We agree with the conclusion of the court below that since there is no dispute as to the amount or grade of the lumber, and the inspection does not determine the kind or texture thereof, which is the bone of contention here, the question of inspection and re-inspection is not material to the issue.

Did the lumber conform to the terms of the specifications as to the kind and quality? It is obvious that the existence of the quality of the thing sold and essential to its identity, was a condition precedent to the sale. That the lumber delivered under the contract was hard hickory poplar is fully proved. It is equally well established that soft yellow poplar was the article to be delivered under the contract. It appears in evidence, and is also a matter of common knowledge, that hickory poplar is practically all sap, cross-grain, heavy, hard in texture, redish or white in color, warps something like gum, and will not stay put. It only can be used for cheap purposes, such as boxes and the like. Whereas, soft yellow

poplar, will not twist and warp, and is used for interior trimmings, floors and fine furniture—in fact in the manufacture of all articles requiring permanency in shape. That the plaintiff was notified of its non-performance of the contract is likewise shown by the record. The rule is that in the sale of lumber of a specified quality, executory for future delivery, the buyer having no opportunity for inspection but relying on the seller to select, there is an implied warranty that the lumber shall be of the grade and quality specified. *Wilson* v. *Wiggin,* 73 W. Va. 560. The sale here was executory for future delivery, by separate car shipments from plaintiff's yards in Kentucky to defendant or its various customers at Philadelphia and other places in that vicinity. The contract did not contemplate that defendant should inspect the lumber before delivery by shipment. The circumstances of the parties were such that the buyer necessarily relied on the seller's judgment to select and not its own. There was, then, in law, an implied warranty by plaintiff that the quality and grade of the lumber shipped by it should be the same quality described in the contract. *Dexter & Carpenter* v. *Fuel Co.,* 90 W. Va. 465. "There is, in America, an implied warranty of *identity,* viz., that the article shall be of the kind or species it purports to be or is described to be; that is, that the article delivered shall be the same thing contracted for." Benjamin on Sales, (7th Am. Ed.) p. 677; *Bridge* v. *Wain,* I Stark. 504; *Shepherd* v. *Kain,* 5 B. & A. 210; *Hogins* v. *Plympton,* 11 Pick. (Mass.) 99; *Lamb* v. *Crafts,* 12 Metc. (Mass.) 355; *Bradford* v. *Manly,* 13 Mass. 139. So, where an article is sold as a certain described commodity, and there is no opportunity for the buyer to inspect it, there is an implied warranty that it is of the description named and salable in the market under that description. *Gardner* v. *Gray,* 4 Camp. 144; *Boorman* v. *Jenkins,* 12 Wend. (N. Y.) 566; *Allan* v. *Lake,* 18 Adol. & Ell. 561. The commodity here not being the kind called for in the contract, there was no obligation on the defendant to accept it.

But, says the plaintiff, the contract must be wholly rescinded or not at all. That this is the rule generally, there is no question. The counsel for plaintiff cites *Ellison* v. *Gro-*

*cery Co.,* 69 W. Va. 380.   Judge BRANNON in that case said: "Upon this question there is a wilderness of authority through many, many years, and conflicting." "I. remark that each contract must stand upon its nature and circumstances." In that case there had been a contract of present sale of chattels to be delivered in future installments covering a considerable time, not to be executed by a single delivery.   Under it 123 car loads of hay had been shipped, there remained to be shipped 77 car loads, when, on account of one car load of bad hay, the grocery company sought to repudiate the whole contract.   As the court there said: "It would seem unjust that this small item should allow the purchaser to annul the contract and leave 77 car loads of hay on the hands of the seller, and make it suffer a loss by having to hunt another purchaser, and sell it at a loss, as the evidence shows that when the defendant canceled the contract hay was falling and materially fell in price."   The conclusion of the court in this case was that "Where a purchaser of chattels has right to rescind the contract, for breach of it, the breach must be in a material matter."   Williston on Contracts says, in Sec. 467, that "As a matter of theory, the excuse of an innocent promisor in a contract should depend on whether he will receive, if he goes on with the contract, substantially what he bargained for.   If he will not receive substantially what he bargained for, he ought not to be required to perform the contract."   But in *Dorr* v. *Midelburg,* 65 W. Va. 778, it was held that "Where [the contract] is severable, one part alone may be rescinded and the other affirmed."   In support of this doctrine: *Worthington* v. *Collins,* 39 W. Va. 406; *Butcher* v. *Peterson,* 26 W. Va. 452.   Where the contract is separable there may be rescission.  *Ledoux* v. *Armor,* 4 Rob. (La.) 381; *Sigerson* v. *Harker,* 15 Mo. 101; *Hochberger* v. *Baum,* 85 N. Y. S. 385; *Costigan* v. *Hawkins,* 22 Wis. 74, 94 Am. Dec. 583.   So, where the contract embraces a number of distinct articles, then even if they are of the same general description, so that a warrant of quality would apply to each, the contract is not entire, but is, in effect, a separate contract for each article, and a right of rescission exists as to each. *Manufacturing Co.* v. *Wakefield,* 121 Mass. 91; *Johnson* v.

*Johnson,* 3 B. & P. 162; *Rubin* v. *Sturtevant,* 80 Fed. 930.
The doctrine announced in the Massachusetts case was approved and applied in our recent case of *Regent Waist Co.*
v. *Morrison Dept. Store,* 88 W. Va. 303. There it was held
that if part of a contract to be performed by one party consists of several distinct and separate items, and the price to
be paid by the other is apportioned to each item to be performed, such contract is in general severable.

A contract is entire, and not severable, when by its terms,
nature and purposes it contemplates and intends that each
and all of its parts, material provisions and the consideration, are common each to the other and interdependent. On
the other hand, a severable contract is one in its nature and
purpose susceptible of division and apportionment, having
two or more parts, in respect to matters and things contemplated and embraced by it, not necessarily dependent upon
each other, nor is it intended by the parties that they shall be.
Hence, an action may be maintained for a breach of it in one
respect and not necessarily in another, or for several breaches,
while in other material respects it remains intact. In such
a contract the consideration is not single and entire as to all
its several provisions as a whole; until it is performed it is
capable of division and apportionment. Thus, though a number of things be brought together without fixing an entire
price for the whole, but the price of each article is to be ascertained by a rate or measure as to the several articles, the
contract in such case may be treated as a separate contract
for each article, although they be included under one contract. If it appear that the purpose was to take the whole
or none then the contract would be entire; otherwise it would
be several. This rule makes the interpretation of the contract depend on the intention of the parties as manifested by
their acts under the circumstances of each particular case.
Let us apply the rules of law thus stated to the case under
consideration. The two contracts here called for fifteen car
loads of lumber, under which the eight car loads in controversy were shipped, each car having a certain price affixed
to it, and the price paid for the whole being susceptible of
apportionment. The sale of each car load was not necessar-

ily interdependent on the sale of all, nor does it appear that they were sold as a single whole. On the contrary, they were spoken of and treated as different subjects of sale. There is an absence of anything that shows a purpose to sell the eight car loads of lumber as an inseparable whole. The plaintiff's act in shipping some of its cars under the contract of June 7, and some under the contract of July 12, conclusively shows that it did not regard the contract as an entire one; nor did the plaintiff ship the number of cars called for in each order. It is in effect a separate contract for each car. Admitting that the first four cars were accepted—the difference as to them having been adjusted—is it reasonable to hold that for that reason there shall be no rescission as to the remaining four cars loaded as in this case with an entirely different species of lumber than the contract called for—entirely useless for the buyer's purposes? Does the case not fall entirely within the rule announced in the foregoing cases, that the contract is severable? We hold that it does. This conclusion finds direct support in *Holmes* v. *Gregg*, 66 N. H. 621. That was a sale of five car loads of lumber under one contract. Three car loads were accepted, and two rejected as not conforming to the order in quality. The Court held that the contract was severable in a sense that the buyer could accept the lumber that conformed to the contract and reject the rest. Then, again, defendant is entitled to rescission on the ground that there was a substantial breach of the contract.

Did the defendant upon rejection of the lumber have the right to sell it as the agent of the seller *ex necessitate rei?* In *Jones* v. *Bloomgarden,* 143 Mich. at page 336, we find the rule stated: ''Where a vendee notifies the vendor within a reasonable time of the rescission of the contract because the goods are not such as were contracted for, and asks what disposition he shall make of them, and the vendor replies, insisting that he has fully performed the contract, the vendee may dispose of the goods at the best price obtainable, and interpose, when sued, the defense of the vendor's non-compliance with the contract.'' The weight of the authority favors the rule above stated, and we think it founded on sound reason.

See *Howard* v. *Hoey,* 23 Wend. (N. Y.) 350; Story on Sales
(1853) §409; Williston on Sales (1909) §498; 2 Mechem,
Sales, §§1392, 1393; 23 R. C. L. §261; *Hitchcock* v. *Griffin,*
99 Mich. 447; *Barnett* v. *Terry,* 42 Ga. 283; *Strauss* v. *Nat'l
Parlor Furn. Co.,* 76 Miss. 343; *Little Rock Grain Co.* v.
*Brubaker,* 89 Mo. App. 1; *Rubin* v. *Sturtevant, supra;* and
*Iron & Coal Co.* v. *Smith,* 66 Pa. 340. In the last cited case
the court held in effect that, after the failure to comply with
the description of the article in the contract of purchase, and
the vendor's refusal to receive the same, it is not the duty of
the vendee to keep the article on hand—especially if it is a
cumbrous article (iron in that case)—and await the pleasure
of the vendor, but he may dispose of the property to the best
advantage possible. To the same effect: *Bach* v. *Levy,* 50 N.
Y. Super. Ct. 519; *Columbian Iron Works & D. D.* v. *Doug-
lass,* 84 Md. 44. In *Dexter & Carpenter* v. *Fuel Co., supra,*
this Court approved the selling of the coal by the buyer, upon
the seller failing to deliver the quality of coal specified in the
contract, at the best price obtainable in the market. As in
the Pennsylvania case, here is a cumbrous article—lumber.
The demurrage and freight charges were heavy. The embargo
existing on the railroads made it practically impossible to re-
turn it to the seller in a distant state. It was a case in which
fair dealing called for the defendant to act as agent for the
seller *ex necessitate rei.* Out of the proceeds of such sale,
the buyer may reimburse himself for only such expenses as
were reasonably incurred in making said sale. In such case
the utmost diligence and good faith will be exacted from the
buyer who thus elects to bear the burden of agency. Aside
from the legal principles hereinbefore announced, the buyer
in the instant case claims that in making the sale he was acting
under an agreement made with Mr. Shannon who came to
Philadelphia in October to inspect the lumber. The de-
fendant had received a letter from the plaintiff a few days
before Shannon's arrival stating: "We have sent Mr. Shan-
non to examine the lumber shipped in R. I. car No. 37528
and if you have any other cars of ours that you are not sat-
isfied with we wish that you would show the lumber in them
also to him." Mr. Fry, a purchasing agent of the defendant

company, says that Shannon agreed with him in regard to the lumber not being of the kind contracted for and told him to sell it, "and if he could not sell it for enough to store it." He said: "If more cars came in and showed up like the one he saw did, there was nothing else for us to do but to go ahead and sell it for their (plaintiff's) account." While admitting that the lumber "had a bad appearance", Shannon entered a denial to making the foregoing agreement. This denial was overborne by the testimony of Violet Henson, a bookkeeper in the defendant's office, who supports Fry in his version of the affair. Lending support to the claim that such agreement was made the record shows that defendant on October 7, wrote the plaintiff: "We have agreed with your Mr. Shannon to pay the freight on the car and we have arranged with a customer of ours, a yard man, to give us piling space in his yard. I am going to move the car there and have the National man inspect it as soon as possible, and Mr. Shannon seems to think this is necessary. We are not agreeing to accept, however, any part of it, but we do agree to sell the car for your account at the earliest possible moment." Again on October 16 defendant wrote plaintiff:

"As per my agreement with your Mr. Shannon, we are going to endeavor to work off and sell this stock for your account, as soon as possible." Five days later defendant wrote plaintiff: "The only thing that we can do for you in the instance of the car in question, is as per my agreement with your Mr. Shannon. We will try to get rid of the car at the best possible advantage, giving to you just what we receive out of it, without any profit to ourselves, as soon as market conditions permit a disposition being made. We stated in our last letter very frankly and clearly why we could not receive further shipments on the order in question as the class of stock that you have forwarded in two of these cars make it impossible to get our customers to take any further shipments of any kind of lumber. We have lost one of our best customers you might say in this deal." It is a significant fact that while the plaintiff wrote numerous letters to the defendant after the time that Shannon should have made this agreement, no reference of any kind was made to the

foregoing statements concerning Shannon's agreement in defendant's letters to them. No disavowal was made of Shannon's authority to make such agreement. Whether or not Shannon had such authority may not be material here, but it serves to show that the plaintiff had full notice through its agent of the character of lumber it had shipped the defendant, that it was rejected by the defendant, and that it was to be sold for its account. In view of the silence of the plaintiff in this matter, the defendant might well have concluded that this action had its sanction.

The last question to be considered is the measure of damages. Ordinarily, when the vendor fails to deliver the property according to his understanding, the measure of damages thereby occasioned is the difference between the contract price and the market value of the article at the time and place where it should have been delivered. In *Wilson* v. *Wiggin*, 77 W. Va. 1, this court cites with approval Mr. Sedgwick, as follows: "The better rule for measuring damages is the difference between the value which the thing sold would have had at the time of the sale, if it had been sound or corresponding to the warranty, and its actual value with the defect." 2 Sedgwick on Damages (9th Ed.) section 792. This rule was applied in *Dexter & Carpenter* v. *Fuel Company*, 90 W. Va. 465. In the latter case, however, the coal was accepted by the defendant, and in the defense of a suit brought by the seller to recover the contract price, on the ground that there was a breach of the warranty as to the kind and quality of the article delivered, the defendant was allowed to recoup in damages the difference between the value which the goods sold would have had at the time of delivery, if of the kind and quality corresponding to the warranty, and the actual value thereof at the time with the defects known. In Virginia, where the goods were rejected by the buyer and returned to the seller, who disposed of them in the market, the measure of damages was held to be the difference between the contract price and the net price which they produced at the resale after deducting the expenses of the seller in taking care of the goods and selling them. *American Hide & Leather Co.* v. *Chalkley*, 101 Va. 458. But the case here does

not come within any one of these rules.  The buyer here re-
jected the lumber and sold it as the agent of the seller.  The
plaintiff brings this suit to recover the full contract price
of the lumber.  The burden is on it to establish that the goods
furnished are of the kind and quality stipulated for.  *Regent
Waist Co.* v. *Morrison Dept. Store, supra.*  No evidence of
the character of the four loads of lumber in question was
offered except the general statement of its superintendent of
the Louisville plant yards that from his observation the cars
were loaded with soft yellow poplar lumber.  The cross ex-
amination of this witness developed the fact that his observa-
tion was cursory; like the *Dexter* v. *Fuel Co. case,* where the
superintendent viewed the coal from the top of the car.  The
court there said that this "would not ordinarily furnish ade-
quate opportunity for inspection."  Even admitting that a
*prima facie case* was made by this doubtful testimony, it was
clearly overborne by the evidence on this point on behalf of
the defendant.  Divers witnesses were offered who testified
to the inferior kind, quality and value of the lumber taken
from the cars in controversy.  There can be no question as
to this testimony turning the scales in favor of the defendant
on the question of the kind, quality and value of the article
of shipment.  It appears that the defendant sold this lumber
at the best price obtainable in the market.  In fact there is
no evidence to the contrary.  In discussing the general rule of
damages, in actions on warranties, either express or implied,
Benjamin on Sales (7th Am. Ed), page 965, in speaking of
defenses to suits for the price, says:  "The prevailing rule in
America is that, in order to prevent circuity of action, a
buyer, when sued for the price, may rely upon a breach of
warranty as a defense *pro tanto,* and so reduce the amount of
plaintiff's recovery, or, if the articles were entirely worth-
less, defeat the whole claim."  This text finds support in
the following cases: *McAllister* v. *Reab,* 4 Wend. (N. Y.)
485; *Cook* v. *Castner,* 9 Cush. (Mass.) 266; *Hitchcock* v. *Hunt,*
28 Conn. 343; *Bouker* v. *Randles,* 31 N. J. L. 335; *Merrill* v.
*Nightingale,* 39 Wis. 247; *Stevens* v. *Johnson,* 28 Minn. 172;
*Marsh* v. *McPherson,* 105 U. S. 709; *Trimmier* v. *Thompson,*
10 S. C. 164; *Seigworth* v. *Leffel,* 76 Pa. 476; *Morse* v. *Brack-*

*ett,* 98 Mass. 205; *Howie* v. *Rea,* 70 N. C. 559; *Kester* v. *Miller Bros.,* 119 N. C. 475; *Smith* v. *Mayer,* 3 Colo. 207; *Dushane* v. *Benedict,* 120 U. S. 639; *Manufacturing Co.* v. *Wood,* 84 Mich. 452; *Birdsall* v. *Palmer,* 74 Md. 201; *Jeffers* v. *Easton,* 113 Cal. 345. The breach of the warranty as to the four car loads of lumber in controvresy here, and the rejection of them by the buyer, being established, under the rule stated by Mr. Benjamin, the buyer will not be driven to his cross action for damages for breach of the contract. But, upon the exercise of the right that we have shown that the buyer has to sell said lumber as agent of the seller *ex necessitate,* he is entitled to abate the plaintiff's claim against him for the contract price of said chattels by accounting for the proceeds of said sale. The plaintiff's damages in its action here, as to the lumber so sold, is the amount of the proceeds of the re-sale, less the expenses as were reasonably incurred in taking care of and selling it.

All these issues of fact—whether the defendant had accepted or rejected the last four car loads of lumber, or had ratified the alleged sale thereof by its subsequent dealings with the plaintiff, what under the circumstances of the case was a reasonable time to wait before selling if the defendant rightfully rejected the lumber, whether it was sold at the best price obtainable, the reasonableness of the expense charges, and whether the defendant throughout acted in good faith— were for the jury. These issues were all decided in favor of the defendant by the learned circuit judge, acting in lieu of a jury. He properly applied the law to these facts. His finding is plainly right on the evidence. Our duty is therefore to affirm the judgment.

*Affirmed.*